# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

LILLIE SAWNEY,                )
                             )
            Plaintiff,        )
v.                           )        Case No. CIV-19-163-SPS
                             )
ANDREW M. SAUL,              )
Commissioner of the Social   )
Security Administration,[1]  )
                             )
            Defendant.        )

## OPINION AND ORDER

The claimant Lillie Sawney requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining she was not disabled.  For the reasons discussed below, the Commissioner's decision is hereby AFFIRMED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age,

---

[1] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security.  In accordance with Fed. R. Civ. P. 25(d), Mr. Saul is substituted for Nancy A. Berryhill as the Defendant in this action.

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A).   Social security regulations implement a five-step sequential process to evaluate a disability claim.   *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied.   *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).  Substantial evidence is "'more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).   The Court may not reweigh the evidence or substitute its discretion for the Commissioner's.   *See Casias v. Sec'y of Health & Human Svcs.*, 933 F.2d 799, 800 (10th Cir. 1991).   But the Court must review the record as a whole and "[t]he substantiality of

---

[2] Step One requires the claimant to establish that she is not engaged in substantial gainful activity. Step Two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied.   If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.   If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry.   Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work.   At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC.   Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work.   *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was fifty-three years old at the time of the most recent administrative hearing (Tr. 70). She completed tenth grade and has worked as a personal care aide (Tr. 70, 95). The claimant alleges that she has been unable to work since August 10, 2013, due to arthritis in her hands, bilateral leg pain, left knee pain, diabetes, high blood pressure, vision problems, and a kidney removal (Tr. 340).

## Procedural History

On October 26, 2015, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85 (Tr. 305-14). Her applications were denied. ALJ John W. Belcher conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated February 23, 2017 (Tr. 152-63). The Appeals Council remanded the case on April 10, 2018 (Tr. 170-71). On remand, ALJ B.D. Crutchfield conducted an administrative hearing and determined the claimant was not disabled in a written opinion dated August 21, 2018 (Tr. 12-24). The Appeals Council denied review, so the ALJ's August 2018 written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made her decision at step five of the sequential evaluation.  She found that the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) with the nonexertional limitations of performing simple tasks with routine supervision, relating to peers and supervisors on a superficial work basis, not relating to the general public, and adapting to a work situation (Tr. 17). The ALJ concluded that although the claimant could not return to her past relevant work, she was nevertheless not disabled because there was work she could perform in the national economy, *e. g.*, conveyor line bakery worker, small product assembler, and agricultural produce sorter (Tr. 23-24).

**Review**

The claimant contends that the ALJ erred by failing to: (i) evaluate all of her impairments at step two, (ii) account for all her impairments in formulating the RFC, (iii) provide a narrative discussion describing how the evidence supports the RFC, (iv) properly evaluate the opinion of consultative examiner Dr. Cooper, (v) pose a hypothetical to the vocational expert ("VE") that included all her limitations, (vi) identify jobs existing in significant numbers that she could perform, and (vii) find her disabled under the Medical-Vocational Guidelines (the "Grids").  The Court finds these contentions unpersuasive.

The ALJ determined that the claimant's diabetes, diabetic neuropathy, medial meniscus tear of the left knee, obesity, and learning disorder were severe impairments, but that her status post left kidney removal, status post resolved renal failure, right eye cataract,

and hypertension were nonsevere (Tr. 14-15).  The relevant medical evidence reveals that the claimant was regularly treated at the Wilma P. Mankiller Health Center in Stillwell, Oklahoma between August 2013 and December 2017 (Tr. 500-51, 843-98).  The claimant's care at this facility generally centered around treatment for diabetes which her treating physicians, Dr. Echeverria and Dr. Sprankell, consistently described as uncontrolled due to noncompliance (Tr. 500-51, 843-98).

At a routine appointment with Dr. Echeverria on November 27, 2013, the claimant reported morning stiffness as well as pain that "may last all day" in her fingers (Tr. 539-42).  On physical examination, Dr. Echeverria found tenderness to palpation in the claimant's proximal and distal interphalangeal joints and indicated her hand pain was probably osteoarthritis (Tr. 540-41).  He prescribed medication and recommended an over the counter cream (Tr. 541).  On December 27, 2017, the claimant reported numbness in her hands, significantly worse on her non-dominant left side.  Dr. Sprankell referred the claimant for a bilateral upper extremity electromyogram, the results of which indicated bilateral peripheral neuropathy (Tr. 843, 865-66).

Providers at Advanced Pain Specialists of Tulsa treated the claimant's left knee osteoarthritis, left knee torn meniscus, and bilateral lower extremity pain between August 2014 and June 2016 (Tr. 613-79, 696-713).  The claimant's treatment largely consisted of narcotic pain medication, but she received steroid injections in her left knee in June and August 2015 (Tr. 634-37, 642-45).  Physical examinations through September 2015 found tenderness, reduced range of motion, and full strength in the claimant's knees bilaterally (Tr. 633-79).  At a follow-up appointment on October 26, 2015, the claimant's right lower

-5-

extremity was normal, but she had crepitus, tenderness, and decreased range of motion and strength in her left knee (Tr. 626).  Beginning in December 2015 and continuing through June 2016, the claimant continued to have varying abnormal physical examination findings as to her left knee, but she consistently reported good pain control and consistently denied medication side effects (Tr. 613-24, 696-713).  By June 2016, the claimant was found to have good improvement in pain, function, and quality of life (Tr. 706, 711).

Regarding the claimant's right knee, physical examinations at Advanced Pain Specialists of Tulsa were abnormal between August 2014 and September 2015 as discussed above, normal between October 2015 and January 2016, and not performed after January 2016 (Tr. 613-80, 696-713).  The claimant presented to the Emergency Department at W.W. Hastings Memorial Hospital ("Hastings ER") on October 6, 2016 and reported worsening intermittent right knee pain that began the week before (Tr. 819-21).  On physical exam, the claimant had mild tenderness on palpation of her medial and lateral patellar joint, good extension, mildly decreased flexion, mild tenderness with valgus stressing, and mild effusion (Tr. 820).  An x-ray taken that day revealed no acute bone change, mild tricompartmental osteoarthritis, and small suprapatellar fluid collection (Tr. 818).  Her right knee was aspirated and injected, and she was diagnosed with right knee osteoarthritis (Tr. 821).  On January 27, 2017, the claimant presented to the Wilma P. Mankiller Health Center and reported right knee pain for three or four months (Tr. 894-96).  Physical examination revealed tenderness and mild edema around her patella with normal range of motion and strength (Tr. 895).  The claimant was prescribed pain medication and a knee orthosis and was advised to rest, ice, compress, and elevate her right

knee (Tr. 896). Three days later, she presented to the Hastings ER with right knee pain and swelling and was provided crutches and a knee immobilizer to use for one week (Tr. 812-17). An x-ray performed that day revealed no acute findings (Tr. 811).

At a routine visit with Dr. Sprankell on July 25, 2017, the claimant reported left shoulder pain that began three weeks earlier (Tr. 881-87). Dr. Sprankell assessed the claimant with rotator cuff arthropathy with degree of frozen shoulder and recommended at home physical therapy exercises (Tr. 882). An x-ray of the claimant's left shoulder taken on September 11, 2017 was normal (Tr. 873). The claimant presented to the Hastings ER on October 14, 2017 and reported that she strained her shoulder a few weeks earlier but had been experiencing left shoulder pain for six months (Tr. 798). An injection was administered to her left shoulder, she was referred to physical therapy, and she was diagnosed with a left shoulder strain (Tr. 798-801).

On December 8, 2015, Dr. Elizabeth Rankin performed a physical consultative examination of the claimant (Tr. 607-12). She observed that the claimant moved about the exam room easily and could pick up and manipulate paperclips without difficulty (Tr. 608). On physical examination, Dr. Rankin found, *inter alia,* mildly decreased range of motion in the claimant's left knee and pain with flexion, weak heel walking bilaterally, and full grip strength bilaterally (Tr. 608-12). She assessed the claimant with bilateral upper and lower extremity peripheral neuropathy, insulin dependent diabetes mellitus, hypertension, left knee osteoarthritis, obesity, and tobacco use (Tr. 608).

William Cooper, Ph.D. performed a consultative metal status examination of the claimant on December 8, 2015 (Tr. 601-05). Dr. Cooper noted the claimant's score on the

reading section of the Wide Range Achievement Test-III suggested third grade sight reading ability and he estimated that she had borderline to low average intellectual ability (Tr. 604). Dr. Cooper concluded that the claimant could understand very simple questions and follow very simple directions, maintain concentration when working on repetitive tasks, and avoid obvious hazards in her environment (Tr. 603-04). He diagnosed the claimant with learning disorder not otherwise specified, bereavement, reading disorder, mathematics disorder, and rule out borderline intelligence (Tr. 604).

State agency physician Dr. James Metcalf reviewed the record in December 2015 and found the claimant could perform the full range of medium work (Tr. 107-09). State agency physician Dr. Matheen Khan reviewed the record in February 2016 and found the claimant could perform the full range of light work (Tr. 131-32).

On December 10, 2015, state agency psychologist Lisa Swisher, Ph.D., completed a mental RFC assessment wherein she concluded that the claimant could perform simple tasks with routine supervision, relate to supervisors and peers on a superficial work basis, and adapt to a work situation, but could not relate to the general public (Tr. 109-11). Dr. Swisher's findings were affirmed on review (Tr. 134).

In her written opinion, the ALJ thoroughly summarized the claimant's testimony the medical evidence, and the opinion evidence (Tr. 17-23). In finding the claimant's right-eye cataract nonsevere at step two, the ALJ noted her visual acuity was 20/30 in both eyes at Dr. Rankin's December 2015 consultative examination and that she did not report vision problems thereafter (Tr. 15). At step four, the ALJ noted Dr. Rankin's normal findings as to the claimant's hands and concluded that the evidence did not support the claimant's hand

-8-

allegations (Tr. 21). Additionally, the ALJ discussed the claimant's isolated left elbow treatment and normal x-ray, her right knee pain and most recent x-ray showing no acute findings, her left shoulder pain and unremarkable x-ray, and her treatment for leg edema caused by cellulitis rather than deep vein thrombosis (Tr. 20). Regarding the claimant's reading and math disorders, the ALJ noted she was not in special education classes in school, completed tenth grade, did not allege disability due to a learning disorder or poor reading ability in her disability applications, and performed semi-skilled work in the past (Tr. 21-22). In discussing the opinion evidence, the ALJ summarized Dr. Cooper's consultative mental status examination findings and opinion but found the claimant's past semi-skilled work was consistent with the mental RFC (Tr. 19, 22). The ALJ gave little weight to the state agency physicians' opinions, finding that light work was more reasonable due to her knee impairment, obesity, and the subsequent medical evidence (Tr. 22-23).[3] The ALJ gave the state agency psychologists' opinions great weight because they were consistent with Dr. Cooper's consultative findings (Tr. 23).

At the administrative hearing, the ALJ elicited testimony from a VE that the claimant's past relevant work was as a personal care aide (DICOT § 354.377-014) (Tr. 95). As relevant to this appeal, the ALJ also elicited testimony from the claimant regarding her ability to read, write, and count, and from her attorney regarding her third-grade reading level (Tr. 76-78). The ALJ posited to the VE an individual with the same age, education,

---

[3] The ALJ incorrectly stated that Dr. Khan limited the claimant to medium work (Tr. 22). While Dr. Metcalf did limit the claimant to medium work, Dr. Khan limited her to light work (Tr. 108, 131).

and past work as the claimant who could perform work with the limitations adopted as the RFC set forth above (Tr. 95-97). The VE testified that such person could not perform the claimant's past work but could perform the following light, unskilled jobs: conveyor line bakery worker (DICOT § 524.687-022) with 25,000 jobs in the national economy, small product assembler (DICOT § 706.684-022) with 190,000 jobs in the national economy, and agricultural produce sorter (DICOT § 529.687-186) with 45,000 jobs in the national economy (Tr. 97-98).[4] Based on this testimony, the ALJ concluded that the claimant could perform the jobs of conveyor line bakery worker, small product assembler, and agricultural produce sorter, and that these jobs existed in significant numbers in the national economy (Tr. 24).

The claimant first contends that the ALJ erred at step two by failing to discuss the severity of her hand arthritis, leg pain, right knee arthritis, left shoulder impairment, reading disorder, and math disorder. This Court and the Tenth Circuit have repeatedly held, "[o]nce the ALJ finds that the claimant has *any* severe impairment, [s]he has satisfied the analysis for purposes of step two. H[er] failure to find that additional alleged impairments are also severe is not in itself cause for reversal." *Hill v. Astrue*, 289 Fed. Appx. 289, 292 (10th Cir. 2008). Thus, even assuming *arguendo* that the ALJ erred by not finding these impairments severe, such error was harmless because she found the claimant had other severe impairments at step two.

---

[4] The ALJ's decision reflects an incorrect DOT number for the conveyor line bakery worker job (Tr. 24).

The claimant next contends that the ALJ erred in her RFC assessment because: (i) the evidence suggests a more restrictive RFC; (ii) the ALJ failed to account for limitations related to her physical and mental impairments, particularly as to her manipulative, reaching, visual, math, and reading abilities; and (iii) the ALJ failed to provide a narrative discussion describing how the evidence supports the RFC. The Court finds that the ALJ did not, however, commit any error in her analysis. As discussed above, the ALJ noted and fully discussed the findings of the claimant's various treating, consultative, and reviewing physicians, and her opinion clearly indicates that she adequately considered the evidence in reaching her conclusions regarding the claimant's RFC. *See Hill,* 289 Fed. Appx. at 293 ("The ALJ provided an extensive discussion of the medical record and the testimony in support of h[er] RFC finding. We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [s]he can determine RFC within that category.'"), *quoting Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004). Furthermore, the claimant does not point to any evidence in the record showing that her left elbow, left shoulder, bilateral hand, visual, reading, and math impairments, either individually or in combination with her other impairments, resulted in any functional limitations. *See Welch v. Colvin*, 566 Fed. Appx. 691, 695 (10th Cir. 2014) (finding harmless any error the ALJ made by not considering the combined effects of all of the claimant's impairments since there was no evidence that such impairments restricted the claimant's ability to work). As the ALJ correctly noted, the claimant did not seek treatment for left elbow pain after August 2014, Dr. Rankin's consultative examination was normal

as to her upper extremities, she did not report a vision problem after her essentially normal vision exam in December 2015, she was frequently encouraged to exercise, no treating physician identified functional restrictions precluding light work, and she performed semi-skilled work in the past (Tr. 15, 19, 22).

The claimant next contends that the ALJ improperly adopted some, but not all of Dr. Cooper's findings, relying on *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), for support. *See Haga*, 482 F.3d at 1208 ("[T]he ALJ should have explained why he rejected four of the moderate restrictions on Dr. Rawlings' RFC assessment while appearing to adopt the others. An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability. . ."). Specifically, the claimant asserts that the ALJ engaged in improper "picking and choosing" when she adopted the state agency psychologists' opinions because they were consistent with Dr. Cooper's opinion but then limited her to simple tasks with routine supervision in the RFC. The Court agrees that Dr. Cooper's limitation of understanding *very simple* questions and following *very simple* directions could arguably be more restrictive than the RFC limitation of performing simple tasks with routine supervision, but finds any error harmless because two of the jobs the ALJ identified as work the claimant could perform are clearly not contrary to Dr. Cooper's opinion regarding the complexity of tasks.

The small product assembler job has a reasoning level of two. *See* DICOT § 706.684-022. A reasoning level of two requires a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized

-12-

situations." *Id*.  The reasoning levels for jobs in the Dictionary of Occupational Titles ("DOT") best identify the level of simplicity (or, conversely, complexity) associated with the job.  *See Cooper v. Barnhart*, 2004 WL 2381515, at *4 (N.D. Okla. Oct. 15, 2004) ("The reasoning level, as identified by Plaintiff, appears more similar to whether or not a claimant has a limitation to performing only simple tasks.") [citations omitted].  As to this job, the Court notes that the task complexity required for level two reasoning has been considered by some courts to be inconsistent with Dr. Cooper's opinion regarding "very simple" questions and directions.  *See Collins v. Colvin,* 2015 WL 13662815, at *13 (D.N.M. July 7, 2015) ("Mr. Collins argues that his limitation to understanding and remembering "very short simple instructions" is inconsistent with jobs requiring even level-two reasoning.  This Court agrees."); *Morris v. Colvin*, 2013 WL 1729007, at *4 (D. Kan. April 22, 2013) (noting the RFC did not limit the claimant merely to "simple instructions" but to "very simple instructions" and finding such limitation conflicted with a reasoning level of two).

In contrast to the small product assembler job, the remaining jobs of conveyor line bakery worker and agriculture produce sorter have reasoning levels of one.  *See* DICOT §§ 524.687-022, 529.687-186.  A reasoning level of one requires a worker to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "deal with standardized situations with occasional or no variables in or from these situations encountered on the job*." Id.*  The Court finds that a reasoning level of one is clearly consistent with Dr. Cooper's limitation to understanding very simple questions and following very simple directions.  "[A] reasoning level [of] 1 does not require the

individual to do anything more than carry out very simple instructions and deal with standardized situations." *Lucero v. Colvin,* 2016 WL 8230297, at *7 (D.N.M. February 16, 2016). Furthermore, a reasoning level of one is the lowest reasoning level. *See* DICOT, App. C, Sec. III (4th ed., revised 1991), 1991 WL 688702. Thus, it stands to reason that since Dr. Cooper limited, but did not preclude, the claimant from understanding questions and following directions, she is capable of understanding and following the most minimal level of instructions. Accordingly, any error the ALJ made in failing to incorporate Dr. Cooper's limitations in the RFC is harmless. *See Lane v. Colvin,* 643 Fed. Appx. 766, 770 (10th Cir. 2016) (holding that the ALJ's failure to incorporate a physician's limitations in the RFC was harmless error where the jobs the VE identified nevertheless met the physician's limitations).

The claimant's remaining arguments relate to the ALJ's findings at step five. At step five, the Commissioner has the burden to show that, given a claimant's background and RFC, the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). *See also Daniels v. Apfel,* 154 F.3d 1129, 1132 (10th Cir. 1998) (citation omitted). The ALJ can satisfy this burden with a VE's testimony. 20 C.F.R. §§ 404.1566(e), 416.966(e). To constitute "substantial evidence," the ALJ must present the VE with all of a claimant's physical and mental impairments before the VE determines whether sufficient jobs exist in the national economy. *Hargis v. Sullivan*, 945 F.2d 1482, 1491-92 (10th Cir. 1991). The ALJ may elicit testimony through hypothetical questions that "relate with precision all of a claimant's impairments . . . ." *Id.* at 1492 (quotation omitted). When the ALJ's RFC

findings are "adequately reflected in the ALJ's hypothetical inquiries to the [VE], the expert's testimony provide[s] a proper basis for adverse determination of [the] case." *Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir. 1993).

The claimant asserts that the ALJ erred at step five by failing to find her disabled through application of the Grids.  Contrary to the claimant's assertion, Rule 202.11 and Rule 202.12 are the applicable rules in this case.  Taken together, these rules direct a decision of "not disabled" for a claimant who is between the ages of fifty and fifty-four (defined as "closely approaching advanced age"), has been limited to light work, has a limited education or less, and whose past work experience is skilled or semi-skilled, whether such skills are transferrable or not.  *See* 20 C.F.R. Part 404, Subpt. P, App. 2, §202.00, Table No. 2, Rules 202.11, 202.12.  To the extent the claimant contends that the ALJ erred by not applying the sedentary exertional table, her argument fails because the ALJ's RFC for a limited range of light work is supported by substantial evidence as explained herein.  Accordingly, application of the sedentary table is inappropriate in this case and the ALJ did not err by failing to find the claimant disabled through such rules.

The claimant's second step five argument is that the ALJ failed to include all her limitations in the hypothetical question to the VE, specifically her reaching, manipulative, and vision limitations.  However, as set forth above, the ALJ clearly considered the claimant's shoulder, hand, elbow, and vision impairments and she does not point to any other evidence to support the limitations she claims.  Accordingly, the ALJ was not required to include additional limitations in her RFC assessment, or in her hypothetical question posed to the VE.  *See Qualls v. Apfel,* 206 F.3d 1368, 1373 (10th Cir. 2000) ("We

-15-

have already rejected [the claimant's] challenges to the ALJ's RFC assessment.  The ALJ propounded a hypothetical question to the VE that included all the limitations the ALJ ultimately included in h[er] RFC assessment.  Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision.").  *See also Adams v. Colvin,* 553 Fed. Appx. 811, 815 (10th Cir. 2014) ("An ALJ does not need to account for a limitation belied by the record when setting a claimant's RFC."), *citing Qualls,* 206 F.3d at 1372.

The claimant next asserts that the ALJ erred at step five in identifying jobs she can perform because:  (i) the reasoning level for the small product assembler job is too complex; (ii) the jobs of small product assembler and agriculture produce sorter require too much visual acuity, reaching, and/or manipulation; and (iii) the math development level, language development level, and exertional level is too high for all three jobs.  "When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the [ALJ] must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled.  The [ALJ] will explain in the determination or decision how he or she resolved the conflict. The [ALJ] must explain the resolution of the conflict irrespective of how the conflict was identified." Soc. Sec. Rul. 00–4p, 2000 WL 1898704, at *4 (Dec. 4, 2000).

The Court need not address each job and its corresponding requirements individually because even assuming *arguendo* that the claimant cannot perform the vision, reaching, manipulation, math, and reading required for the small product assembler and agriculture produce sorter jobs, she can perform the job of conveyor line bakery worker (DICOT § 524.687-022).  *See, e. g., Stokes v. Astrue,* 274 Fed. Appx. 675, 684 (10th Cir.

2008) (finding any error on whether claimant could perform a job was harmless error since there were still two jobs the claimant could perform and no "reasonable factfinder could have determined that suitable jobs did not exist in significant numbers in either the region where Ms. Stokes lives or several regions of the country.").

The Math Development Level ("MDL") for the conveyor line bakery worker job is one, which includes the following skills: "Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound." DICOT § 524.687-022. An MDL of one is the lowest level. *See* DICOT, App. C, Sec. III (4th ed., revised 1991), 1991 WL 688702. Similarly, the conveyor line bakery worker job has a Language Development Level ("LDL") of one, which includes the following reading skills: "Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers." DICOT § 524.687-022. An LDL of one is also the lowest level. *See* DICOT, App. C, Sec. III (4th ed., revised 1991), 1991 WL 688702. Notably, the claimant's past relevant work as a personal care aide (DICOT § 354.377-014) has a level two MDL and LDL and the ALJ found the claimant could not perform her past work because the skill and exertional levels were too high, not because the MDL and the LDL were too high. In any event, the VE was aware of the claimant's reading and math abilities since the ALJ elicited testimony from both the claimant and her attorney on these issues and the hypothetical question posed to

the VE included a person with the same education as the claimant.[5]  *See Halsell v. Astrue*, 2011 WL 3818892, *3 (W.D. Okla. July 20, 2011) (holding the claimant's reading disorder was accounted for where he testified as to his reading limits at the administrative hearing and the ALJ used the terms "same education" in the hypothetical posed to the VE).

The claimant nevertheless contends that she is unable to perform math or read at the levels indicated for the conveyor line bakery worker job, pointing to Dr. Cooper's findings that she could read at a third grade level and his reading and math disorder diagnoses. Similarly, the claimant also contends that she is unable to perform the six hours of walking and standing required for light work due to the combined effect of her diabetic neuropathy and bilateral knee impairment.   However, as discussed above, the ALJ thoroughly summarized the relevant evidence in the record, including Dr. Cooper's assessment, the claimant's reading score, the treatments notes related to her legs and knees, and her hearing testimony, and the ALJ's opinion clearly indicates that she adequately considered the evidence of record when formulating the claimant's RFC.  Furthermore, the only suggested physical limitations in the medical record were those stated by the state reviewing physicians, which the ALJ adopted, *added more restrictive limitations* of her own, *and still concluded* that the claimant could perform a reduced range of light work.

Lastly, the claimant contends that the ALJ did not make a finding that 25,000 conveyor line bakery worker jobs, standing alone, existed in significant numbers because

---

[5] The claimant likewise asserts without support that the ALJ erred by determining that she had a limited education without explanation in her written opinion.  But the ALJ *did account* for a person with the same education and any error the ALJ may have made in this regard is harmless.

her significance finding was based on all three jobs she identified.  The determination that work can be performed in significant numbers is considered case-specific, and "the issue of numerical significance entails many fact-specific considerations requiring individualized language as applied to a particular claimant's factual situation."  *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004), *quoting Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992).  The Tenth Circuit has held that this finding is not limited to local or regional numbers but is instead a determination of whether work exists in significant numbers in the regional *or* national economy.  *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).  Here, the Court is persuaded that 25,000 jobs available nationally for the conveyor line baker worker is significant.  *See Fox v. Colvin*, 2015 WL 5178414, at *4 (W.D. Okla. Sept. 3, 2015) ("The *Rogers* [*v. Astrue*, 312 Fed. Appx. 138, 142 (10th Cir. 2009)] decision came out the same year as *Raymond*, and that court implicitly found, as a matter of law, without engaging in a multi-factor analysis, that 11,000 jobs in the national economy is significant.  The Court is persuaded by *Rogers* and finds that 32,000 utility tractor jobs in the national economy is also significant.").  *See also Stokes,* 274 Fed. Appx. at 684 (where the two remaining available jobs cited by the ALJ, there were 11,000 jobs regionally and 152,000 nationally, "we do not believe any reasonable factfinder could have determined that suitable jobs did not exists in significant numbers in either the region where Ms. Stokes lives or several regions of the country.").

When all the evidence is taken into account, the conclusion that the claimant could perform a reduced range of light work is supported by substantial evidence. *See Hill,* 289 Fed. Appx. at 293 ("The ALJ provided an extensive discussion of the medical record and

-19-

the testimony in support of h[er] RFC finding. We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [s]he can determine RFC within that category.'"), *quoting Howard v. Barnhart*, 379 F.3d at 949. The ALJ specifically noted every medical record available in this case, gave reasons for her RFC determination, and ultimately found that the claimant was not disabled. This was "well within the province of the ALJ." *Corber v. Massanari*, 20 Fed. Appx. 816, 822 (10th Cir. 2001) ("The final responsibility for determining RFC rests with the Commissioner, and because the assessment is made based upon all the evidence in the record, not only the relevant medical evidence, it is well within the province of the ALJ."), *citing* 20 C.F.R. §§ 404.1527(e)(2); 404.1546; 404.1545; 416.946. The gist of the claimant's appeal is that the Court should re-weigh the evidence and determine her RFC differently from the Commissioner, which the Court simply cannot do. *See Casias*, 933 F.2d at 800 ("In evaluating the appeal, we neither reweigh the evidence nor substitute our judgment for that of the agency.").

## Conclusion

In summary, the Court finds that correct legal standards were applied by the ALJ, and the decision of the Commissioner is therefore supported by substantial evidence. The decision of the Commissioner of the Social Security Administration is accordingly hereby AFFIRMED.

**DATED** this 22nd day of September, 2020.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**